UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Joseph A. Ligotti, Jr.

v.                                    Civil No. 08-cv-119-JL
                                      Opinion No. 2008 DNH 123
David Garofalo

**O R D E R**

Each of the parties seeks a preliminary injunction preventing the other from using the yet-unregistered service mark, "The Guy from Boston." Alleging that his rights in the mark are superior, the plaintiff, Joseph A. Ligotti, Jr., commenced this action, which claims, among other things, that the continued use of the mark by the defendant, David Garofalo, amounts to trademark infringement and unfair competition in violation of § 43(a) the Lanham Act, 15 U.S.C. § 1125(a), and New Hampshire law.[1] Garofalo, however, claims that he has the superior rights in "The Guy from Boston," so it is Ligotti who is

---

[1]Both Ligotti's complaint and Garofalo's counterclaim make other claims that neither asserts as a basis for his motion for preliminary relief. In deciding the motions, then, the court has not considered these additional claims. See MJM Prods. v. Kelley Prods., Inc., 2003 DNH 159, 10. Furthermore, while Ligotti argues a claim for copyright infringement in support of his motion, his complaint does not contain any copyright claim; more importantly, he has neither alleged nor provided evidence of any registered copyrights. The court rules that Ligotti has not shown a likelihood of success on any copyright theory. See 17 U.S.C. § 411(a); Torres-Negron v. J & N Records, LLC, 504 F.3d 151, 156 (1st Cir. 2007).

engaged in trademark infringement and unfair competition by his continued use of the mark.

The court has jurisdiction over this matter under 28 U.S.C. §§ 1331 (federal question) and 1367 (supplemental jurisdiction). The court first heard argument on the parties' motions on April 3, which concluded with an order for additional briefing on the issue of ownership of the mark in accordance with the standards set forth in <u>Bell v. Streetwise Records, Ltd.</u>, 640 F. Supp. 575 (D. Mass.) (Zobel, J.), <u>aff'd without op.</u>, 787 F.2d 578 (1st Cir. 1986).[2]  The district court in <u>Bell</u> issued this opinion after the First Circuit had vacated and remanded the initial order in the case.  761 F.2d 67 (1st Cir. 1985).[3]

Together with this briefing, the parties also submitted additional evidentiary materials, principally the competing affidavits of Ligotti and Garafalo, that revealed sharp disputes

---

[2]At the hearing, the court also offered to make an interim order governing the parties' affairs until a decision could be reached on their cross-motions, but they concluded that no such order could fairly accommodate both sides' interests.

[3]In this decision, Judge Wyzanski wrote for the court, with Judges Breyer and Coffin separately concurring in all respects but one:  instead of affirming the district court's order on different grounds, they voted to remand the case to "allow the parties an opportunity to present further evidence and argument in light of [the] opinions."  761 F.2d at 75.  In citing to the First Circuit's <u>Bell</u> decision, then, this court will not differentiate further between the multiple opinions.

as to many potentially significant facts.  To resolve these
disputes, the court held an evidentiary hearing on the motions
over May 19-20 and May 29-30, at which the court heard the live
testimony of Ligotti, Garafalo, and several other witnesses, and
received a number of exhibits.[4]  Having considered this evidence,
and the parties' accompanying arguments, the court grants
Ligotti's motion in part and denies it in part, and denies
Garofalo's cross-motion in its entirety.

## I.   <u>Applicable Legal Standard</u>

In deciding whether to grant a motion for a preliminary
injunction, a court must consider four factors:  (1) the movant's
likelihood of success on the merits of his claims; (2) the risk
of irreparable harm to the movant if the injunction is not
issued; (3) how that harm compares to any harm the defendant
faces if the injunction does issue, and (4) how granting or
denying injunctive relief would affect the public interest.  <u>See</u>,
<u>e.g.</u>, <u>Naser Jewelers, Inc. v. City of Concord</u>, 513 F.3d 27, 32
(1st Cir. 2008).  While all of these factors must be considered,
"[t]he sine qua non of this four-part inquiry is likelihood of

---

[4]These exhibits included numerous videos of Ligotti's
performances and appearances, which the court has since reviewed
in their entirety.

success on the merits." <u>New Comm Wireless Servs. v. SprintCom,
Inc.</u>, 287 F.3d 1, 8 (1st Cir. 2002).  This is particularly true
when the movant seeks a preliminary injunction on the basis of a
trademark claim, since irreparable harm generally follows from
infringement, <u>I.P. Lund Trading ApS v. Kohler Co.</u>, 163 F.3d 27,
33 (1st Cir. 1998), and "as a matter of public policy, trademarks
should be protected against infringing uses," <u>Borinquen Biscuit
Corp. v. M.V. Trading Corp.</u>, 443 F.3d 112, 115 (1st Cir. 2006).
So, as more fully discussed <u>infra</u>, the resolution of the parties'
cross-motions depends on which of them is more likely to succeed
on his claim to ownership of "The Guy From Boston" mark.


**II.   <u>Background</u>**

For purposes of the cross-motions, the court makes the
following findings of fact, <u>see</u> Fed. R. Civ. P. 52(a), based on
the testimony and exhibits received at the evidentiary hearing,
as well as the materials submitted beforehand, <u>see</u> <u>Asseo v. Pan
Am. Grain Co.</u>, 805 F.2d 23, 26 (1st Cir. 1986) (noting with
approval that "[a]ffidavits and other hearsay materials are often
received in preliminary injunction proceedings"); <u>see also</u> <u>MJM
Prods.</u>, 2003 DNH 159, 2.

Garofalo owns The Two Guys Cigar Shop, which has retail
locations in the southern New Hampshire communities of Salem,

4

Nashua, and Seabrook and, as what Garofalo describes as "the largest cigar retailer in the world," also conducts a significant business in mail and Internet orders.  In early 2006, Garofalo had the idea of promoting his business by using a character called "The Guy from Boston," based in large part on an existing character called "The Kid from Brooklyn" who has appeared in a series of videos on the Internet.  Garofalo envisioned "The Guy from Boston," like "The Kid from Brooklyn," as a champion of individual rights and freedoms who would present his views by "yelling and screaming" in front of an American flag in performances to be viewed on the Internet, known as "rants."  Unlike "The Kid from Brooklyn," however, "The Guy from Boston" would rant in a Boston accent while holding a cigar, thus promoting Garofalo's Boston-area cigar business.  Garofalo's first conception of the character did not include any thoughts about his physical appearance, such as his ethnicity, build, or dress.

Garofalo engaged a website designer with whom he had previously worked, William Vining, to create an Internet site for "The Guy from Boston," and to register the Internet address www.theguyfromboston.com.  Garofalo also set about selecting somebody to play the role of "The Guy from Boston."  After his first choice turned down the opportunity, Garofalo offered it to

5

Ligotti, describing "The Guy from Boston" as a version of "The Kid from Brooklyn" who would perform "rants" on the Internet as a means of advertising Garofalo's cigar business.  Garofalo proposed to compensate Ligotti in the form of half of the net revenue; it is disputed, and ultimately irrelevant for present purposes, whether this was meant as half of all revenue generated by the character in any medium, or only the website.  Because Garofalo intended to pay the start-up expenses himself, he explained, the arrangement would cost Ligotti nothing.

Though Ligotti had doubts about the success of the endeavor, jokingly calling Garofalo "out of his mind," he accepted the offer.  Ligotti understood that this resulted in a partnership as to the website; Garofalo understood that he retained sole ownership of the business, with the parties sharing net revenue only.  Nothing memorializing the agreement was put into writing.

Using a video camera he had purchased, Garofalo filmed Ligotti performing six rants, entitled "Fourth of July," "Press '1' for English," "Spank 'em," "Take This Pill," "Cigars," and "Cell Phones" while positioned in front of an American flag displayed in the lounge of Garofalo's store.  Having reviewed the videos of these rants, the court credits Garofalo's testimony that Ligotti performed them by reading from scripts that Garofalo had composed and written out on cue cards beforehand though, as

6

Garofalo acknowledged, Ligotti did not simply recite the scripts verbatim.  The court also credits Garofalo's testimony that each of these rants, save one, was shot in multiple takes; that Garofalo gave Ligotti direction during the taping; and that, after the taping, Garofalo edited the video of each rant.  In each of these six rants, Ligotti used some variant what the parties have since come to identify as "The Guy from Boston"'s catch phrase:  "I've got the balls to say what you're thinking." In one of the many direct contradictions in the parties' testimony, both Ligotti and Garofalo take credit for originating that phrase, though neither was able to corroborate his claim.[5] They also disputed who had the idea of how "The Guy from Boston" should dress--he appears in either an open-collared shirt with a heavy gold necklace or with a dark shirt and light tie--or, indeed, whether Ligotti simply dressed that way to begin with.

Vining posted these rants to the www.theguyfromboston.com website for viewing in early August.  Garofalo also sent an e-

---

[5]In an attempt to do so, Garofalo produced a baseball bearing the catchphrase and the website address, which he had ordered to sell through the website.  But he could not recall, or produce any evidence of, when he had placed the order, so it could have been well after Ligotti originated the phrase by spontaneously using it in the first rant, as he claimed.  The only third-party witness present for the filming of the first six rants could not recall whether the phrase was in the scripts prepared by Garofalo.

mail to a list of some 17,000 customers of his smoke shop exhorting them to visit the site, and placed a photograph of "The Guy from Boston" on the cover of the Two Guys mail-order cigar catalog.  Garofalo and Ligotti proceeded to shoot another rant for the website each week, so that 28 rants on various topics, e.g., "Express Line," "Road Rage," "Lottery Tickets," appeared there by the end of 2006.  In these rants, as their titles suggest, Ligotti generally expressed frustration at the problems of everyday life, while playing to a stereotype of his Italian-American ethnicity, gesticulating dramatically and using phrases like "Minga!" and "Fuhgeddaboutit!,"[6] in addition to frequent profanity.  A few of the rants--"St. Anthony's Feast," "Sauce or Gravy"--focused on eating, capitalizing on Ligotti's substantial girth; he weighs more than 400 pounds.  The 2006 performances, in addition to three "bonus" rants, were also compiled into a DVD,

---

[6]"Minga!" as used in the rants, is an Italian expression of exasperation or surprise, though it can have a more vulgar meaning in other contexts.  The myriad uses of ""Fuhgeddaboutit!" were memorably illustrated in a monologue by the title character in the film Donnie Brasco, starring Johnny Depp and Al Pacino, which dramatized FBI Special Agent Joseph Pistone's autobiographical account, in his book of the same name, of his undercover infiltration of New York's Bonnano crime family.  Indeed, Garofalo testified that, in the earlier rants, "The Guy from Boston" embodied a sterotypical "gangster" style.

"The Guy from Boston:  The Very First Season," assembled by Garofalo and offered for sale through the website.[7]

In one of these "bonus" rants, "How It Began," Ligotti explains that he created "The Guy from Boston" as a way to entertain his nephew while he was serving in the American armed forces in Iraq.  But Garofalo testified, without serious challenge from Ligotti, that this account was a story concocted to generate interest in "The Guy from Boston."  The court finds that the same is true of the account, which Garofalo later gave to third-party witnesses James Langan and Anthony Palmisano, that Garofalo came up with the idea of "The Guy from Boston" from observing Ligotti ranting and raving on various subjects to the delight of his fellow customers during his visits to the cigar store.  The court credits Garofalo's claim that he created "The Guy from Boston" character without having Ligotti, or any particular person aside from "The Kid from Brooklyn," in mind.

The story does not end there, however.  Ligotti and Garofalo continued to shoot rants and post them to the website on roughly a weekly basis well into 2007.  Under Garofalo's direction, the content of these performances focused less on Italian-American stereotyping, and more on political issues, than had the 2006

---

[7]There was no evidence as to sales of this DVD, if any.

9

rants, though eating continued to factor prominently.  But these materials were attracting relatively little attention.  During the first year of its operation, in fact, the website generated only about $2,000 in sales of cigars and other merchandise, fees for "personalized rants" ordered through the site, and revenue from the placement of advertisements there, resulting in a net loss of nearly $7,500 in the form of expenses paid solely by Garofalo.  Neither side presented evidence of traffic on the website or any other indicia of its popularity before January 2008, when, according to Ligotti, the site received a peak of eight or nine million hits before leveling off at around five or six million hits per month thereafter.

Meanwhile, by Garofalo's own account, his role in creating each rant diminished and Ligotti's correspondingly increased as the detailed scripts Garofalo had prepared for the earlier performances were gradually replaced by lists of facts or "bullet points" he had assembled on a particular topic, and Ligotti more frequently made up his own lines on the spot.  Garofalo, unsurprisingly, retained hardly any of these written materials, but a comparison of the few "scripts" that were introduced into evidence to their respective rants--namely, "2nd Amendment," "Happy Halloween," and "Shit"--demonstrates that Ligotti's

10

performances followed the "scripts" in only the loosest sense.[8]
The generally unpolished nature of the post-2006 performances
further supports this point, as well as the related point that
fewer takes were required to produce a rant suitable for posting
on the website.[9]

The testimony of third-party witnesses also corroborates
this view.  While Vining recalled having seen Ligotti perform two
rants by reading from cue cards prepared by Garofalo, and which
required several takes, both of these rants were among Ligotti's
earliest:  "Fat Chicks" and "Sauce or Gravy."  In contrast,
Langan and Palmisano, who did not witness the filming of rants
until 2007, testified that in those performances--"Screwed Up

---

[8]Exceptions are "Illegal Immigrants," in which Ligotti
essentially recites a number of purported statistics on the
subject compiled by Garofalo, and "Americans are Beautiful," a
rant from the first season in which Ligotti essentially reads a
version of the spirited defense of the United States by Canadian
broadcaster Gordon Sinclair (which was widely re-circulated
following the terrorist attacks of September 11, 2001), revised
by Garofalo, as "America the Beautiful" plays in the background.

[9]Explaining that his practice was to erase all other takes
of each rant after selecting the version for the website,
Garofalo was unable to produce any alternative takes of rants at
the evidentiary hearing.  A few days later, however, he submitted
a few takes of two rants, as well as numerous takes of a third,
he had since located on his computer.  This evidence, which the
court received over Ligotti's objection, is consistent with the
finding that rants filmed in 2007 generally required only a few
takes--the one rant for which Garofalo submitted numerous takes,
"Illegal Immigrants," was unusual in that regard, according to
Garofalo's own testimony.

Senators" and "Ho Ho Ho"--Ligotti referred to nothing more than some notes prepared by Garofalo and required only a few takes. The court finds that, while Ligotti did not perform the rants for the website "off the top of his head," as he claims, he also did not simply read from scripts prepared by Garofalo, as he claims. Instead, at least from the beginning of 2007 onward, the rants consisted largely of impromptu performances by Ligotti on subjects chosen by Garofalo, who also contributed elements used in the rants, gave Ligotti direction, and edited them afterwards.

Despite the website's meager revenues, "The Guy from Boston" persona began attracting some attention from the local Boston media by mid-2007.  Ligotti--introduced as "Joe Ligotti, The Guy from Boston"--appeared on "Chronicle," a television news magazine program, once in late June 2007 and again in late October 2007, and a few times on "The Phantom Gourmet," a food program broadcast on both television and radio, around the same time. These segments were unscripted, with Garofalo's involvement generally limited to giving Ligotti a few ideas beforehand, e.g., suggesting which restaurants he should mention, and occasionally sending an e-mail to a list of visitors to "The Guy from Boston" website notifying them of the upcoming appearance.[10]  The

---

[10]The "Chronicle" segments also briefly showed portions of rants and other materials from "The Guy from Boston" website.

appearances came about through the efforts of Jason Rivera, a
Florida-based disc jockey whom Ligotti had retained as a manager
after appearing on his radio show.[11]

In October 2007, Garofalo managed to convince a long-time
business associate, Michael Chiusano, to pay $20,000 for "The Guy
from Boston" to adopt one of Chiusano's cigar brands as the
character's exclusive smoke.  When the potential for this deal
revealed itself, in late August 2007, Garofalo sent an e-mail to
Ligotti presenting his view of the "financial time line" of "The
Guy from Boston" endeavor.  The e-mail stated, in relevant part:

> The understanding made on July 17, 2006 between Joe
> Ligotti and David Garofalo was the following:  The Guy
> from Boston and www.theguyfromboston.com was [*sic*]
> owned by David Garofalo.  Joe was to come on as the
> talent aka The Guy From Boston and the arrangement was
> that David would pay all expenses and it was to cost
> Joe nothing.  He would receive 50% of the net profits
> after expenses after all money paid by David is paid
> back.  A 50/50 split on all profit after expenses.

Garofalo also claimed to have paid more than $7,000 in expenses
for which he had yet to be reimbursed, despite the more than
$3,000 earned by "The Guy from Boston," mostly from sales of
merchandise on the website.  As this e-mail suggests, Garofalo

---

[11]The parties sharply disputed the circumstances of Rivera's
hiring.  Garofalo claimed that Ligotti hired Rivera without
Garofalo's knowledge, but that once he found out about it he
"ratified" the hire.  Ligotti claimed that he simply hired Rivera
over Garofalo's objection.  As explained infra, this dispute has
little relevance to the issues presented by the cross-motions.

was responsible for handling the financial affairs of "The Guy from Boston" endeavor.[12]

In response to this message, Ligotti e-mailed Garofalo, "Boy, this sounds official, huh?" to which Garofalo responded, "This is just so everyone understands what is supposed to be going on here . . . . Now is the time to say differently, before the big break--not after."  Ligotti does not appear to have responded further, and testified at the hearing, in fact, that he did not recall any of the messages in the chain.  And the exchange was only slightly more memorable for Garofalo.  Despite Ligotti's claim to superior trademark rights in "The Guy from Boston" in both this litigation and a demand letter preceding it, Garofalo did not cite or even produce the e-mails until the eve of the evidentiary hearing.  The same goes for a meeting among Ligotti, Garofalo, Chiusano, and his brother, held just after the e-mail exchange, where Garofalo claims to have asserted his ownership of "The Guy from Boston" and the website and received Ligotti's assent; the meeting was not mentioned in Garofalo's

---

[12]Ligotti did have access to a "Paypal" account that was set up to receive payments on orders placed through the website, but ended up taking money out of that account for his own personal use--a transaction noted as a "bank transfer" in the e-mail from Garofalo, who at that point had just discovered that the money had gone missing.  After receiving the e-mail, Ligotti admitted to having taken the money, which was ultimately repaid.

declarations or any other material he submitted prior to the
evidentiary hearing.[13]

In any event, Garofalo's prediction of a "big break" was
soon fulfilled, though not necessarily in the way he envisioned
it.  On Veterans Day 2007, "The Guy from Boston" was interviewed
on "Your World with Neil Cavuto," a program on the Fox News
network (though Cavuto was apparently under the misimpression
that "The Guy from Boston" was the host of his own Internet radio
show).  Using that moniker, either alone or in conjunction with
his real name, Ligotti went on to appear several more times on
"Your World," as well as on another Fox News program, "Fox and
Friends," throughout late fall 2007 and winter 2008.[14]

During these brief segments, the show's hosts asked Ligotti
his thoughts on a variety of topics in the day's news, which he
appears to have given extemporaneously, though with the benefit
of some research performed by Garofalo when the men knew the
topics ahead of time.  Beyond providing this research, and

_____

[13]Moreover, Chiusano testified at the hearing that, based on
his recollection of the meeting, Ligotti seemed to believe that
he had a right of fifty percent ownership in the venture itself,
rather than just a right to fifty percent of its revenues.

[14]Aside from the parties' recollection, the only evidence of
these appearances provided to the court was a videotape of two
"Your World" segments and three "Fox and Friends" segments
submitted by Ligotti, although he recalls having appeared on
these programs some fifteen times.

occasionally driving Ligotti to the tapings at the Fox studio in Boston, Garofalo had no other involvement with Ligotti's appearances on Fox News.  Ligotti's comments during these appearances generally track the political views expressed in the rants, but in a considerably less abrasive tone, as he engages in a humorous rapport with the programs' hosts.

Right after his initial appearance on Fox News, "The Guy from Boston" first appeared on local Fox affiliate in Boston, Fox 25, in an interview with the station's political editor.  Fox 25 then approached Ligotti about becoming a full-time employee, leading to a series of meetings among its representatives, Ligotti, and Garofalo.  The station proposed that, as part of an agreement to hire Ligotti for two years at a six-figure annual salary, it would take control of the www.theguyfromboston.com website.  In response, Garofalo asserted that he owned both "The Guy from Boston" name and the website, and refused to relinquish them.  Ligotti remained quiet--a decision he now attributes to his reluctance to argue with Garofalo in front of Fox 25's representatives--but confronted Garofalo after the meeting. Though the parties dispute the precise content of Garofalo's response, the court finds that, in essence, Garofalo told Ligotti that they should await a more lucrative offer.

16

None was forthcoming, but Ligotti did continue to appear as "The Guy from Boston" on Fox 25, paid at the rate of a few hundred dollars per appearance, without any further objection from Garofalo.  In these nearly twenty appearances,[15] Ligotti usually gives a report, comprised of on-location interactions and interviews, on a lighthearted subject, e.g., recipes for a Super Bowl party, or Valentine's Day gift ideas. Garofalo does not claim to have been involved in any of these appearances, which are clearly unscripted.

In the apex of his rise to semi-celebrity status, Ligotti appeared as a guest on "The Tonight Show" with Jay Leno on January 17, 2008.  Garofalo was not present for "The Tonight Show" taping, but helped prepare Ligotti for his appearance, including through communications with Rivera, who had accompanied Ligotti to Los Angeles on Garofalo's nickel.  Most of these instructions were highly general, e.g., Ligotti should appear

---

[15]Only three of these segments were submitted into evidence, but many of them are available for viewing on the Fox 25 website, www.myfoxboston.com (follow "Politics" hyperlink; then follow "The Guy From Boston" hyperlink under "FOX25 Insiders" heading). Given the more lenient evidentiary standards applicable in preliminary injunction proceedings, the court has taken judicial notice of these materials.  In a comment accompanying them, the website explains that "Funnyman Joe Ligotti, better known as the Guy from Boston, is not afraid to say what you're thinking."  The website also contains "The Guy from Boston's Blog," which contains four brief comments of his own creation, in addition to several responses from other users, posted during March 2008.

"very animated," but a few related to the content of his appearance, _e.g._, that he should "stay straight on target" with his anti-immigrant, pro-military stance, and, significantly, "push" the www.theguyfromboston.com website.

Aside from a brief retelling of the fictionalized account of how he came to appear on the Internet by sending videos of rants to his nephew in the Army, however, Ligotti did not mention the website, Two Guys Smoke Shop, or even cigars--Garofalo had wanted Ligotti to incorporate cigars into his appearance, but "Tonight Show" producers nixed that idea.  Instead, Ligotti provided a series of humorous responses to Leno's questions about food, politics, and marriage.  Leno did describe his guest--introduced as "The Guy from Boston, Joe Ligotti,"--as "one of the most outspoken personalities on the Internet," referencing "his website, theguyfromboston.com."  Traffic on the site peaked just following Ligotti's appearance on "The Tonight Show," then leveled off, as previously mentioned.

Hoping to take advantage of this surge in popularity, Ligotti retained Fred Balboni, a talent manager and publicist with whom he had a pre-existing social relationship.[16]  Balboni

---

[16]There was considerable--and conflicting--testimony over whether Ligotti had previously tried to hire Balboni; the court considers that point irrelevant to the issues before it.

soon discovered, by searching the United States Patent and
Trademark Office database, that--unbeknownst to Ligotti--Garofalo
had applied to register to himself "The Guy from Boston" as a
trademark for "entertainment services" on October 15, 2007.  As a
specimen of the use of the mark in commerce, Garofalo submitted
an advertisement for "The Guy from Boston" brand cigars
consisting of a photograph of Ligotti and a caption explaining,
"The cigar chomping 'The Guy from Boston' is an Internet
celebrity with a lot of opinions."

    This discovery enraged Ligotti, who testified that he had
previously asked Garofalo about registering "The Guy from Boston"
trademark, only to be assured by him that it was not necessary
(though Garofalo said he did not recall this).  In any event,
Garofalo's application was preliminarily denied on a number of
bases, including that it did not specify the nature of the
entertainment services at issue and the mark was used in the
specimen as "a personal name that only identifies the name a
[*sic*] specific individual . . . it does not function as a service
mark to identify and distinguish applicant's services from those
of others and to indicate their source."  Ligotti, at Balboni's
suggestion, proceeded to register variants of the
"www.guyfromboston" domain name with suffixes besides ".com,"
including ".net," and ".biz."  As it turned out, Garofalo had

19

registered the domain name "www.joeligotti.com" to himself on
January 26, 2008, just two weeks after Ligotti's appearance on
"The Tonight Show."

On March 17, Ligotti, accompanied by Balboni, met with
Garofalo to discuss the trademark registration, as well the
status of their business relationship.  After learning that
Balboni was entitled to a percentage of "The Guy from Boston"'s
future earnings as Ligotti's new manager, Garofalo responded that
Balboni's percentage would have to come out of Ligotti's half of
the profits, leaving Ligotti with little money for himself.  This
led to a dispute over ownership of "The Guy from Boston," with
Garofalo claiming that he had trademarked the name, only to have
Balboni demonstrate that the application had been denied--which
was news to Garofalo.  The parties were unable to reach an
agreement for going forward with "The Guy from Boston" by the end
of the meeting, though they did make plans for Ligotti to film
some "personal rants" the next day to fill outstanding orders.

Later that night, however, in a phone call to Ligotti,
Garofalo cancelled those plans and announced that he was
suspending operations.  Garofalo also instructed Vining to shut
down the website until a different person could be found to
appear as "The Guy from Boston," which happened the next day.
Since then, nearly twenty rants featuring the new "Guy from

20

Boston" have been posted on the www.theguyfromboston.com site,
while those featuring Ligotti have been removed.[17]   These rants
generally discuss politics and other mundane subjects in loud and
profane language, but appear much more heavily scripted than
Ligotti's performances, at least those from 2007 onward.   The new
"Guy from Boston" is also considerably svelter than Ligotti and
favors casual clothing over collared shirts and jewelry, but,
like Ligotti in his rants, always holds a cigar.   Since Ligotti
was replaced as "The Guy from Boston" on the website, traffic has
fallen by at least half.

In the meantime, Ligotti has been operating his own website
at www.theguyfromboston.net.   The site contains approximately
twenty rants, including some filmed by Garofalo and originally
posted on the www.theguyfromboston.com site, as well as links to
some of Ligotti's appearances on television and in the print
media.   Through his new site, Ligotti has received hundreds of e-
mails expressing some form of confusion as to his replacement as
"The Guy from Boston" on the www.theguyfromboston.com site,
though some of these appear to be in response to Ligotti's public
accounts of how that came to pass.   Ligotti, as previously noted,

---

[17]These materials, as well as those on the current
www.theguyfromboston.net site, were not submitted into evidence,
but the court has viewed them over the Internet, an approach to
which neither party objected when informed of it at the hearing.

also continues to refer to himself as "The Guy from Boston" in his semi-regular appearances on Fox and elsewhere in the media.

III. **Analysis**

A.    **Likelihood of Success on the Merits**

Each side seeks to enjoin the other's continued use of "The Guy from Boston" as trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1125(a), and New Hampshire law, specifically, N.H. Rev. Stat. Ann. § 358-A:2, I-III.  To succeed on this claim under either federal or state law, a plaintiff must show, first, that its mark is distinctive and, second, that the defendant's allegedly infringing use of the mark is likely to cause confusion among consumers.  See, e.g., Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 769 (1992); Auto Body Specialists, Inc. v. Vallee, 127 N.H. 382, 385 (1985).[18]  For purposes of their cross-motions, the parties agree that "The Guy from Boston" is a distinctive mark and that consumer confusion will likely result from their competing uses of it.  What they dispute is ownership of the mark, which of course is a necessary

---

[18]Neither party argues that its claim under the New Hampshire law of trademarks and unfair competition, as codified in § 358-A:2, requires a different analysis from its claim under the federal Lanham Act, so the court will not further discuss New Hampshire trademark and unfair competition law separately.

prerequisite for relief on a trademark claim.  <u>See</u>, <u>e.g.</u>, <u>DeCosta</u>
<u>v. Viacom Int'l, Inc.</u>, 981 F.2d 602, 605 (1st Cir. 1992).

Despite the parties' agreement on the distinctiveness of
"The Guy from Boston" mark, that point requires some additional
discussion, for reasons that will become clear later in the
court's analysis of the ownership issue.  Marks fall into five
categories of distinctiveness:  generic, descriptive, suggestive,
fanciful, and arbitrary.  <u>Colt Def. LLC v. Bushmaster Firearms,</u>
<u>Inc.</u>, 486 F.3d 701, 705 (1st Cir. 2007).  The significance of
this categorization is that suggestive, arbitrary, and fanciful
marks are considered inherently distinctive, while a descriptive
mark becomes distinctive--and thus eligible for trademark
protection--only upon a showing of secondary meaning.  <u>Two Pesos</u>,
505 U.S. at 769.  "This showing requires the trademark holder to
establish that 'in the minds of the public, the primary
significance of [the mark] is to identify the source of the
product rather than the product itself.'"  <u>Borinquen Biscuit</u>, 443
F.3d at 116 (quoting <u>Inwood Labs., Inc. v. Ives Labs., Inc.</u>, 456
U.S. 844, 851 n.11 (1982) (bracketing by the court)).

 Here, because the parties each claim to hold a valid
trademark in "The Guy from Boston," they do not analyze whether
that validity proceeds from the inherently distinctive nature of
that phrase, or the secondary meaning it has acquired.  Garofalo

notes, however, that "[t]he parties do not dispute the fact that THE GUY FROM BOSTON mark is a suggestive-descriptive mark that has acquired secondary meaning,"[19] and Ligotti has not disagreed. In accordance with this view, the court finds that "The Guy from Boston," as used to identify the parties' entertainment services in the form of the Internet-based rants and other media appearances,[20] is a descriptive mark.

"'A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of [services].  A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the [services].'"  Equine Techs., Inc. v. Equitechnology, Inc., 68 F.3d 542, 544 (1st Cir. 1995) (quoting Blinded Veterans

---

[19]This import of this statement is somewhat unclear because, as just discussed, suggestive marks--unlike descriptive ones--are inherently distinctive and therefore need not acquire secondary meaning to become protectable.  Thus, "any reliance on the doctrine of secondary meaning for this purpose is an implicit confession that the mark was originally, and therefore may still be, purely descriptive."  3 Callman on Unfair Competition, Trademarks and Monopolies § 18:10, at 18-176--18-177 (Louis Altman, ed., 4th ed. 2004) (footnote omitted).  In any event, for the reasons discussed in the proceeding text, the court finds that "The Guy from Boston," in the manner it has been used by the parties, is a descriptive mark, not a suggestive one.

[20]Though "The Guy from Boston" was used in connection with the sale of goods, principally cigars, the parties' dispute, for the moment at least, arises out of the use of the mark for entertainment services only.

Ass'n v. Blinded Am. Veterans Found., 872 F.2d 1035, 1040 (D.C. Cir. 1989)).  "The descriptive-suggestive borderline is hardly a clear one," 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 11:66, at 11-147 (4th ed. 1992 & 2007 supp.), but the court believes that "The Guy from Boston" lies to the descriptive side.  The phrase conveys the salient characteristics of the services, namely, the attitudes of a "regular guy" from Boston, without demanding any imaginative leap whatsoever.  Cf. Attrezzi, LLC v. Maytag Corp., 436 F.3d 32, 38 (1st Cir. 2006) (upholding finding that Italian word for "tools," used to sell kitchen appliances, was suggestive because "the term can easily be viewed as suggesting a similarity, not an identity, between ordinary workman's tools and electrical appliances").

This finding draws additional support from the geographic component of "The Guy from Boston" name.  The category of descriptive marks includes geographic designations that merely identify a subset of the services' attributes, i.e., their location or origin.  2 McCarthy, supra, § 14:1, at 14-4--14-5; see also Boston Beer Co. Ltd. P'ship v. Slesar Bros. Brewing Co., 9 F.3d 175, 180 (1st Cir. 1993).  "The Guy from Boston" serves that purpose:  not only did Garofalo choose that name as a way to capitalize on his own ties to Boston, but the services marketed under the name depend heavily on that locale for their style, in

25

particular the character's accent, and their substance, which often tends toward issues of local interest.  This use of the geographic designation in "The Guy from Boston" makes it a geographically descriptive mark.  <u>See</u> <u>Mid-West Mgmt., Inc. v. Capstar Radio Operating Co.</u>, No. 04-C-720, 2004 WL 2535404, at *4-*5 (W.D. Wis. Oct. 21, 2004) (finding phrase "Madison's Progressive Talk," as used in connection with radio broadcast from Wisconsin city of the same name, to be descriptive).

Having decided on the proper characterization of the mark, the court returns to the issue of ownership.  "As between conflicting claimants, it is well settled that the right to use the same mark is based on priority of appropriation." <u>Blanchard Importing & Distrib. Co. v. Charles Gilman & Son, Inc.</u>, 353 F.2d 400, 401 (1st Cir. 1965); <u>see also</u> <u>Volkswagenwerk Aktiengesellschaft v. Wheeler</u>, 814 F.2d 812, 815 (1st Cir. 1987). These "conflicting claimants" are often two competitors in a marketplace, each of whom claims to have started making commercial use of the mark before the other.  <u>See</u>, <u>e.g.</u>, <u>Blanchard Importing</u>, 353 F.2d at 401.  The question of ownership can also arise, though, when an entity that had been using a mark--such as a partnership or joint venture--dissolves.  <u>See</u> 2 McCarthy, <u>supra</u>, § 16:42, at 16-68.3--16.68.4.  There, "[w]hen arguing parties are, in a sense, both responsible for the success

26

of a name, a court may find it difficult to decide which, in fact, 'owns' the name; the temptation may be great to say 'both own it' or try to 'divide' the name among them." <u>Bell</u>, 761 F.2d at 76.  This difficult case is no exception.  Yet the principal purpose of trademark law is to protect consumers from confusion as to the source of a product or service, <u>see</u>, <u>e.g.</u>, <u>I.P. Lund Trading</u>, 163 F.3d at 35-36, and this "public interest . . . normally requires an exclusive award" of the mark to one party or the other, <u>Bell</u>, 761 F.2d at 76.

Following this guidance from the circuit, the district court in <u>Bell</u>, on remand, arrived at a test for assigning ownership of a mark in these circumstances.  640 F. Supp. at 580.  The competing claimants in <u>Bell</u> were, on one hand, the teenaged members of the popular Boston-based 1980s singing group New Edition, and, on the other, their original manager, Maurice Starr, whom the group was seeking to jettison in favor of new representation.[21]  <u>Id.</u> at 577-79.  Though most of the members had

---

[21]The members of the group--Ricardo Bell, Michael Bivins, Bobby Brown, Ronald DeVoe, and Ralph Tresvant--all went on to prosper after New Edition eventually dissolved:  Bell, Bivins, and DeVoe formed Bell Biv Devoe, a popular group in its own right, while Tresvant and Brown had successful solo careers. Starr, for his part, went on to manage another chart-topping Boston-based teenaged musical group, New Kids on the Block.  Joel Whitburn, <u>The Billboard Book of Top 40 Hits</u> 436-37 (4th ed. 1996).

entered into contracts recognizing that the "New Edition" name belonged to a record company affiliated with Starr, they had since exercised their right to disaffirm these agreements, which were signed while the members were still minors.  <u>Id.</u> at 578 & n.10.  Starr responded by replacing the original members of the group with different performers and applying to register the "New Edition" trademark for his own benefit.  <u>Id.</u> at 579.

In preliminarily resolving the trademark dispute in favor of the group's original members, the district court relied on two alternative rulings.  <u>Id.</u> at 580-82.  First, the court ruled that the original members had made the prior appropriation of the mark in <u>intra</u>-state commerce by performing as "New Edition" in and around the Boston on at least twenty occasions before Starr orchestrated the release of their first single in a broader market, <u>id.</u> at 580; though Starr began working with the group before that point, he had "played little if any role" in these local performances, <u>id.</u> at 578.

Second, the court ruled that even in the absence of this prior appropriation by the group's original members, "they nevertheless own the mark under the controlling standard of law" applicable "in the case of joint endeavors, where prior ownership by one of several claimants cannot be established."  <u>Id.</u> at 580. The court articulated this standard as "which party controls or

28

determines the nature and quality of the goods which have been marketed under the mark in question." Id. (citing In re Polar Music Int'l AB, 714 F.2d 1567, 1569 (Fed. Cir. 1983)).  For purposes of this inquiry, "the nature and quality of the goods" are the characteristics associated with them, and therefore the mark, by the consuming public.  Id. at 581.

The test, then, subsumes two independent inquiries:  "a court must first identify that quality or characteristic for which the [mark] is known by the public.  It then may proceed to the second step of the ownership inquiry, namely, who controls that quality or characteristic."  Id.  Applying this test, the court ruled:

> the quality which the mark New Edition identified is first and foremost the five [original members] with their distinctive personalities and style as performers.  The 'goods' therefore are the entertainment services they provide.  They and no one else controlled the quality of those services.  They own the mark.

Id. at 582.  This court, as previously noted, has ordered the parties to argue their competing claims to "The Guy from Boston" mark in accordance with Bell's analysis.[22]

---

[22]Though the First Circuit did not expressly consider this approach on the second appeal, which produced only a summary affirmance, a number of courts and commentators have adopted or endorsed the Bell test for ownership of a jointly held mark following the fragmentation of the joint entity.  See, e.g., C.V. Starr & Co. v. Am. Int'l Group, Inc., No. 06 Civ. 2157, 2006 WL

At the outset, however, Garofalo maintains that <u>Bell</u>'s test
for resolving ownership between former participants in a defunct
joint endeavor does not apply because the first commercial
appropriation of "The Guy from Boston" occurred solely as a
result of his efforts in conceiving the character, setting up the
website, writing, directing and editing the rants initially
posted there, and otherwise getting everything off the ground in
the summer of 2006.  Garofalo thus likens himself to the original
members of New Edition, who, the <u>Bell</u> court ruled, had first
appropriated the mark through activities in which Starr's
participation was tangential at best.  640 F. Supp. at 580.  The
court generally accepts Garofalo's view of the preeminence of his
role in the early going, but it does not necessarily follow that
he owns the mark as a result.

While it is true that ownership of a mark inheres in the
party who makes the first commercial appropriation, <u>see Blanchard
Importing</u>, 353 F.2d at 401, "appropriation" equals "use" in this

---

2627565, at *3-*4 (S.D.N.Y. Sept. 14, 2006); <u>Liebowitz v.
Elsevier Sci. Ltd.</u>, 927 F. Supp. 688, 696 (S.D.N.Y. 1996); <u>In re
Atl. Recording Corp.</u>, 747 N.Y.S.2d 889, 891-92 (N.Y. Sup. Ct.
2002); 2 McCarthy, <u>supra</u>, § 16:45, at 16-71--16-78; Mark
Traphagen & Robert D. Litowitz, <u>The Song Remains the Same--But
Not Necessarily the Same</u>, 39 Am. U. L. Rev. 975, 989-90 (1990);
<u>accord</u> <u>Rick v. Buchansky</u>, 609 F. Supp. 1522, 1537-38 (S.D.N.Y.
1985) (applying similar test in dispute between musical group's
manager and its members decided contemporaneously with <u>Bell</u>).

<u>sense only when the mark is inherently distinctive</u>, <u>i.e.</u>,
receives trademark protection without a showing of a secondary
meaning.  2 McCarthy, <u>supra</u>, § 16:34, at 16-56--16-57.  "The Guy
from Boston," as discussed <u>supra</u>, is not an inherently
distinctive mark, and Garofalo has not argued otherwise.  So
"mere priority of use is insufficient.  It is the party who first
achieved trademark significance in the mark through secondary
meaning who is the senior user."[23]  2 McCarthy, <u>supra</u>, § 16:34,
at 16-56; <u>see also</u>, <u>e.g.</u>, <u>PaperCutter, Inc. v. Fay's Drug Co.</u>,
900 F.2d 558, 564 (2d Cir. 1990).

This rule usually requires a court to decide which of two
parallel uses of the same mark by competitors first achieved the
requisite level of significance.  <u>See</u>, <u>e.g.</u>, <u>PaperCutter</u>, 900
F.2d at 565.  Here, the question arises in slightly different
circumstances--the parties agree that "The Guy from Boston" had
acquired secondary meaning by the time they started making
competing uses of the mark in March 2008--but the nature of the
inquiry is fundamentally the same.  The court must decide whether
secondary meaning accrued while Garofalo was still making sole
use of the mark, or at some later point after Ligotti's role had

---

[23]The district court in <u>Bell</u>, in contrast, appears to have
treated "New Edition" as an inherently distinctive mark belonging
to the party who made the first use of it as part of a present
plan of commercial appropriation.  640 F. Supp. at 579-80.

increased such that "The Guy from Boston" had become a joint
endeavor.  Indeed, the First Circuit in <u>Bell</u> appears to have
relied on the same analytical framework, ruling that, in the
first round of the proceedings, the original members "failed to
prove that their trade name had any secondary meaning in the
phonorecord world either locally or nationally" when they signed
on with Starr, 761 F.2d at 72--an event which, depending on the
evidence on remand, might have marked the start of a joint
endeavor, <u>id.</u> at 76.[24]

  "'Proof of secondary meaning entails vigorous evidentiary
requirements.'"  <u>Boston Beer</u>, 9 F.3d at 181 (quoting <u>Perini Corp.</u>
<u>v. Perini Constr., Inc.</u>, 915 F.2d 121, 125 (4th Cir. 1990)).  The
party claiming secondary meaning bears this heavy burden, <u>id.</u>;
here, that is Garofalo, whose theory that he alone made the first
appropriation of "The Guy From Boston" requires a showing that
the mark acquired secondary meaning during that time.[25]  <u>Cf.</u>

_____

  [24]On remand, however, the district court found "that there is
only one relevant market here:  the entertainment market," in
which, as previously discussed, the original members of the group
had made the first commercial appropriation of "New Edition"
through a series of local performances.  640 F. Supp. at 580.

  [25]The court acknowledges having accepted the parties'
stipulation that "The Guy from Boston" has secondary meaning.
But this stipulation is not enough for Garofalo to succeed on his
theory that he owns the mark as a result of making the first
commercial appropriation, which he introduced in response to the
court's order for the parties to argue their cases in accordance

<u>Bell</u>, 761 F.2d at 71.  Again, a mark achieves secondary meaning

when its primary significance to the public is to identify a

particular source of a service, rather than simply the service

itself.  <u>Borinquen Biscuit</u>, 443 F.3d at 116.  "The only direct

evidence probative of secondary meaning is customer surveys and

testimony of individual consumers."  <u>Yankee Candle Co. v.

Bridgewater Candle Co.</u>, 259 F.3d 25, 43 (1st Cir. 2001).  No

reliable evidence of that kind was introduced.[26]

Secondary meaning may also be proven through circumstantial

evidence, including, but not necessarily limited to:  (1) the

length and manner of the mark's use, (2) the nature and extent of

its advertising and promotion, (3) the efforts made to promote a

conscious connection between the mark and the source of the

---

with <u>Bell</u>.  Again, that theory works only if (1) "The Guy from
Boston" is inherently distinctive, which it is not, or (2) the
mark achieved secondary meaning during the period of Garofalo's
sole use.

[26]The only "consumers" of "The Guy from Boston" who testified
were Ligotti's nephew, who received videos of a number of the
rants while stationed in Iraq, and Chiusano, who purchased
advertising on the www.theguyfromboston.com website.  While each
suggested, at least obliquely, that he associated "The Guy from
Boston" with one of the parties or the other, that testimony
cannot carry much weight because each of the witnesses had prior
dealings with that party before being exposed to the mark.  <u>See</u>
<u>MJM Prods.</u>, 2003 DNH 159, 15-16 (finding multiple affidavits by
viewers of film, claiming they associated its title with
plaintiffs, to "constitute unpersuasive evidence of secondary
meaning" due to the affiants' prior dealings with plaintiffs).

services, and (4) the services' established place in the market.
MJM Prods., 2003 DNH 159, 17 (citing Yankee Candle, 259 F.3d at
43-44, and I.P. Lund, 163 F.3d at 41).  The circumstantial proof
on these points received in connection with the cross-motions for
injunctive relief demonstrates that "The Guy from Boston" did not
achieve secondary meaning--if at all--until well after the point
when, by any reasonable view of the evidence, the use of the mark
had become a joint effort between Ligotti and Garofalo.

    Though Garofalo made efforts to promote "The Guy from
Boston" upon the appearance of the www.theguyfromboston.com site
in the summer of 2006, including a mass e-mail to his cigar store
customers and the placement of mark on the cover of his cigar
catalog, this advertising does not appear to have generated much
interest.  In the entire first year of the site's operation, in
fact, sales of merchandise, personalized rants, and advertising
totaled only $2,000, and there was no other evidence presented of
the site's popularity during that time.  "'While evidence of
. . . advertising and promotional activities may be relevant to
determining secondary meaning, the true test of secondary meaning
is the effectiveness of this effort to create it.'"  Yankee
Candle, 259 F.3d at 44 (quoting Int'l Jensen, Inc. v. Metrosound
U.S.A., Inc., 4 F.3d 819, 824 (9th Cir. 1993)).  Given the meager
success of "The Guy from Boston" during its inaugural year, the

court concludes that Garofalo's efforts were insufficient to
create secondary meaning in that period.  See, e.g., DeGidio v.
W. Group Corp., 355 F.3d 506, 513 (6th Cir. 2004) (upholding
finding that "lawoffices.net" lacked secondary meaning without
evidence of consumer survey or market share and with evidence of
$2,500 in advertising costs and $200 in revenue); Dover Sports,
Inc. v. Hockey.com, Inc., No. 04-448, slip op. at 17-18 (D.N.H.
Jan. 28, 2005) (finding that "hockey.com" lacked secondary
meaning despite $700,000 in on-line sales from that site and
others, as well as advertising).[27]

   "The Guy from Boston" did eventually attract some attention
from the mainstream media in November 2007, starting with
appearances on "Your World with Neil Cavuto" and culminating in

---

[27]Even if the court could infer some level of traffic on the
website in 2006 or 2007 from other evidence in the record, that
number alone would fall short of establishing secondary meaning,
i.e., that those visitors associated "The Guy from Boston" with
the services offered on the site and no other source.  "Mere use
of a website does not equal identification with a particular
provider."  DeGidio, 355 F.3d at 513.  Indeed, in the act of
surfing the web by following a series of links or with the
assistance of a search engine, a user may visit a website without
necessarily learning its name, let alone whether there is a
particular source responsible for the content there.  See Xuan-
Thao N. Nguyen & Jeffrey A. Maine, Taxing the New Intellectual
Property Right, 56 Hastings L.J. 1, 54-55 (2004-2005) (noting
that, in light of this reality, "[c]ourts often demand consumer
survey evidence demonstrating that Internet consumers perceive
the domain name as a source identifier, not as a description of
the products or services at the Web site").

"The Tonight Show" segment, which increased traffic on the
website to eight or nine million hits in the month of January
2008.  While it is perhaps doubtful that even this level of
exposure, in and of itself, conferred secondary meaning on "The
Guy from Boston" mark, the issue here is simply whether the mark
acquired secondary meaning during the period of sole use by
Garofalo.[28]  He has not shown a likelihood of success on his
claim that it did.  And, by the fall of 2007, Garofalo was no
longer solely responsible for the use of "The Guy from Boston"
mark.  He had little involvement in Ligotti's television
appearances, and even the rants filmed at that time relied
heavily on Ligotti's spontaneous contributions.

This is not to diminish Garofalo's role in the success of
"The Guy from Boston" during this period; he was still
conceiving, directing, and editing the rants, providing research
and guidance for some of Ligotti's other appearances, and,
significantly, running the business side of things.  But the use
of "The Guy from Boston" mark had clearly become a joint endeavor

---

[28]In fact, Garofalo's argument that he alone made the first
commercial appropriation of the mark identifies that point as the
appearance of the first rants on the website in the summer of
2006.  That use alone comes nowhere near the exposure necessary
to confer secondary meaning on the mark.  "No secondary meaning
emerges full-blown at the time a mark is adopted."  3 Callman,
supra, § 20:29, at 20-214 (footnote omitted).

between the two men, just as the use of the "New Edition" mark
had become a joint endeavor between the performers and Starr by
the release of their first album.  Bell, 640 F. Supp. at 578-79.
If anything, the case for a joint endeavor in Bell was weaker
than the case for one here:  Starr "ran the show" in recording
the group's demo tape, which contained a song he had composed;
"expended considerable effort in attempting to sell it to a
recording company"; prevailed upon the performers to add a fifth
member; and "selected, produced, and for the most part" wrote the
group's first album.  Id.  These contributions exceed, by any
measure, Garofalo's contributions to "The Guy from Boston" when
it started to get widely noticed, thus approaching the secondary
meaning essential to its validity as a trademark.  See Two Pesos,
505 U.S. at 769.

     Having found that the parties were engaged in a joint
endeavor at the time of the first effective commercial
appropriation of "The Guy from Boston," the court moves on to
apply Bell's test for deciding ownership of a mark under these
circumstances.  The "court must first identify that quality or
characteristic for which the [mark] is known by the public."  Id.
at 581.  Ligotti argues that these qualities align with his own
physical and personal traits, because he is "The Guy from Boston"
in the minds of the public.  Garofalo argues that, to the

37

contrary, the public associates "The Guy from Boston" with the
content and style of the character's performances, rather than
with Ligotti's individual persona.  As these positions suggest,
"[t]he issue to be resolved is whether the mark signifies
personalit[y], or style and quality regardless of personalit[y]."
2 McCarthy, <u>supra</u>, § 16:45, at 16-72.

As just discussed, neither side has offered a survey or
other helpful consumer testimony to indicate directly what the
public thinks.[29]  Ligotti does observe that "the fewer the number
of performers in a group, the greater the likelihood that the
service mark or name of the group is identified with those
persons rather than with a style or quality of the group
regardless of personalities," <u>id.</u> § 16:45, at 16-71, but that is
a self-described "general rule" that can serve only as the
beginning point for the court's analysis.[30]  The court is thus

---

[29]Ligotti, as previously mentioned, came forward with a slew
of e-mails received via his ".net" site expressing confusion--and
in some cases outrage--over the fact that he had been replaced by
another "Guy from Boston" on the ".com" site.  As this court
observed in <u>MJM Productions</u>, however, the hand-selected comments
of a group of fans is hardly a substitute for a consumer survey,
particularly when those comments may have been informed by a
party's own publicized views on a pending trademark dispute.
2003 DNH 103, 15-16; <u>see also</u> note 26, <u>supra</u>.

[30]To similar effect is the trademark examiner's comment, in
initially rejecting Garofalo's attempt to register "The Guy from
Boston," that "[t]he personal name of a performer or group is
registrable as a service mark only where the record shows that it

left to draw inferences on this point from how the changing nature of the services offered under the mark appear to have affected the consumer response to it.

Again, the content of the rants conceived by Garofalo--which he identifies as "patriotism, individual rights, anti-taxation, pro-military, and pro-firefighters," as well as "Boston versus New York"--does not seem to have resonated with the public to the degree that Ligotti's unscripted performances in the mainstream media have, at least on the record as it stands. Indeed, while Ligotti addressed subjects similar to those in the rants during some of his earlier television appearances, e.g., he chastised Congress for not making English the country's official language both in his first "Your World" segment and on "The Tonight Show," the bulk of his work in that medium deals with a broader range of issues in the news, including a number of decidedly apolitical ones. Even the topics of the rants themselves vary more than Garofalo acknowledges, dealing with everything from "American Idol" to "Illegal Immigrants." It follows that the public associates the mark not with the particular subjects "The Guy

_____

is used in a manner that would be perceived by consumers as
identifying the services in addition to identifying the person or
group" (citing In re Mancino, 219 U.S.P.Q. 1047, 1048 (T.T.A.B.
1983) and In re Carson, 197 U.S.P.Q. 554, 555 (T.T.A.B. 1977)).

39

from Boston" discusses--that field is far too wide--but with his particular way of discussing them.

Garofalo admits that the style of "The Guy from Boston"'s performances is indeed one of the mark's salient characteristics. But he defines that style in a broad sense--"a heavy Boston accent; the use of a cigar as a prop; the loud, obnoxious presentation of the scripted ideas; and the general dress of the character, including the use of jewelry and a partially unbuttoned shirt"--which could embrace nearly anyone playing the character, not just Ligotti.  This may have been how Garofalo first envisioned "The Guy from Boston," but it is not how the public has come to view it.

Ligotti's television appearances, at least beyond the first "Your World" segments, are characterized by his lighthearted and often self-effacing rapport with the interviewer or the camera. They are not "the loud, obnoxious presentation of scripted ideas."  Nor do they regularly feature the cigar or any recognizable style of dress (though Ligotti does always speak with a distinct Boston accent).  Moreover, many of "The Guy from Boston" performances, including a substantial number of the rants, rely explicitly on Ligotti's girth and ethnic appearance for their humor; also noteworthy, though not to the degree Ligotti has urged, are the frequent references to "The Guy from

Boston" by Ligotti's name--an association on which Garofalo
attempted to capitalize by registering "www.joeligotti.com" to
himself.  The court agrees with Ligotti that "it was personality,
not marketing, that led to the public's intimacy with [the
mark]."[31]  Bell, 640 F. Supp. at 582.

Garofalo objects to this entire line of analysis, arguing
that "[p]ublic association . . . has minimal relevance in
determining trademark ownership" in the first place.  Curiously,
he derives this proposition from Bell, where the district court
noted that Starr had "argued, and the Court of Appeals has
confirmed, that the 'finding that the public associate[s] the
name NEW EDITION with the plaintiffs [does not compel] the
conclusion that the name belong[s] to the plaintiffs.'"  640 F.
Supp. at 581 (quoting 761 F.2d at 76).  The district court went
on to clarify, however, that Starr and his co-defendants were
"wrong when they say that public association plays no part in
determining mark ownership.  It is crucial in establishing just
what the mark has come to identify, i.e., what the 'goods' are."
Id. at 581 (citing 2 McCarthy, supra, § 16:14, at 16-35).  And

---

[31]In this regard, the court credits the testimony of James
Langan--the only disinterested witness with any professional
background in the television business who appeared at the
hearing--that "The Guy from Boston" caught his attention when he
saw him on television because of Ligotti, and "you couldn't make
up Joe Ligotti."

the district court proceeded to decide that the original members
of the group owned its name because "the quality which the mark
New Edition identified was first and foremost [them] with their
distinctive personalities and style as performers." Id. at 582.
Bell flatly contradicts Garofalo's view.

It is true, as the district court recognized in Bell, that a
ruling that one member of a former joint endeavor owns the mark
"does not necessarily follow" from a finding that the public
associates the mark with that member. Id. at 581.  That was one
of the principal teachings of the concurring opinion on appeal by
Judges Breyer and Coffin, who remarked that

> firms frequently develop 'fictional names' and hire
> employees to play the named role.  The firm's express
> purpose may be to have the public associate the
> fictional name with the live employee; but that
> association does not automatically give the employee
> the right to the name.  Presumably, for example, CBS,
> not Richard Boone [who appeared in its series "Have
> Gun, Will Travel"] owns the name 'Paladin' [the
> character he played].  In the absence of a specific
> contract, to decide who owns the name may require a
> court to examine all the relevant circumstances,
> including the history of the parties' relation to each
> other and their likely understandings in order to reach
> an equitable decision.

761 F.2d at 76 (citations omitted).  Sensitivity to these
factors, however, does not require obliviousness to others,
including consumer attitudes on whom the mark has come to
represent; it is just that such evidence should not

42

"automatically" trigger an award of the mark to one party or the other.  See id. (criticizing district court's original order for "jump[ing] without explanation" from a finding of public association to ownership).  Indeed, "[c]ourts have traditionally . . . weighed the public interest concerning trademarks against the interest in contract enforcement."  T & T Mfg. Co. v. A. T. Cross Co., 587 F.2d 533, 538 (1st Cir. 1978); see also 2 McCarthy, supra, § 16:40, at 16-68-16.68.1 ("The determination of trademark joint ownership issues should be resolved by a balancing of these two policies").  That public interest, again, requires the protection of consumers from "the very 'source' confusion that legal trademark, and tradename, doctrine developed to avoid."  Bell, 761 F.2d at 76.

Here, unlike in Bell, the parties never entered into a contract allocating "The Guy from Boston" mark to either of them. In proposing the venture to Ligotti, Garofalo, by his own admission, did not discuss ownership of the mark, but simply "assumed" that he owned it.  The parties' initial conversations, in fact, left Ligotti thinking they had become partners, while Garofalo contemplated sole ownership of the business with Ligotti's interest limited to half of the net revenue.

The subject does not appear to have come up again until Garofalo's August 2007 e-mail claiming sole ownership of "The Guy

43

from Boston and www.theguyfromboston.com."  Whatever the
circumstances suggest Ligotti could have meant, either
objectively or subjectively, by his offhand response, this
exchange offers little insight into the parties' understanding as
to ownership of the <u>mark</u>--to which, it should be noted, Garofalo
has asserted no contractual right in this litigation.  Indeed,
there is no credible evidence that Garofalo intended to settle
ownership of the mark in this exchange; he was principally
concerned with his right to reimburse himself for his outstanding
costs, including the funds from the PayPal account depleted by
Ligotti, out of Chiusano's $20,000 payment before giving Ligotti
his share.  Similarly, though Garofalo later claimed ownership of
"The Guy from Boston" name at the parties' meeting with Fox 25,
the circumstances suggest this was more of a tactical ploy to
force the station into making a better offer than an accurate
reflection of the parties' agreement--particularly given
Garofalo's acquiescence as Ligotti went on to use the name in his
repeated appearances for Fox 25.

        Given this state of affairs, "the history of the parties'
relation to each other and their likely understandings," <u>Bell</u>,
761 F.2d at 72, offers little guidance as to ownership of the
mark and therefore little counterweight to its association with
Ligotti in the minds of the public.  <u>See</u> 2 McCarthy, <u>supra</u>, §

16:44, at 16-170 ("Since the parties have not provided

contractually for trademark rights upon dissolution, the

'contractual expectation' policy should have no weight.")  This

is quite different from the situation that troubled the court of

appeals in <u>Bell</u>, where the original members of the group had

signed "employment contracts" relinquishing any rights to the

"New Edition" mark and confirming that it was "wholly owned" by

the record company.  761 F.2d at 70.  While these agreements were

ultimately voided under Massachusetts law, they were nonetheless

a strong indicator of the parties' intentions as to ownership of

the mark.  The record here lacks any comparable evidence.

In a similar vein, Garofalo argues that "The Guy from

Boston" is a "concept character," akin to what the district court

in <u>Bell</u> recognized as "a 'concept group,' whose name belongs to

the person or entity that conceived both concept and name.'"  640

F. Supp. at 581.  Based on expert testimony presented in that

case, the court described "concept groups" as

> formed mainly by independent record companies who,
> perceiving an unfulfilled 'niche' in the entertainment
> market, hire a group to promote their 'concept,' or
> marketing idea.  <u>The record company owns the name and
> controls the product</u>.

<u>Id.</u> at 581 n.18 (emphasis added).  Even assuming that the use of

"concept characters" in product marketing mirrors the use of

"concept groups" in the recording industry--unlike the court in

45

<u>Bell</u>, this court heard no evidence on that point--Garofalo did
not control "The Guy from Boston" product to the degree necessary
to support his "concept character" theory.

Under <u>Bell</u>, once a court identifies what quality or
characteristic the public associates with a mark formerly used as
part of a joint enterprise, the inquiry proceeds to "who controls
that quality or characteristic."  640 F. Supp. at 581.  It
follows, from the court's finding that the public associates "The
Guy from Boston" with Ligotti's personality and physical
appearance, that Ligotti does.  To paraphrase Judge Zobel yet
again, "the quality which the mark . . . identified was first and
foremost [Ligotti] with [his] distinctive personalit[y] and
style[] as [a] performer[] . . . .  [He] and no one else
control[s] the quality of those services."  <u>Id.</u> at 582.

In arguing to the contrary, Garofalo relies heavily on his
asserted "right" to control all aspects of Ligotti's performances
as "The Guy from Boston," even his television appearances.[32]
Despite the fact that Garofalo played no role in the vast

---

[32]Garofalo also argues that he controlled the content of "The
Guy from Boston" rants by writing, directing, and editing the
performances.  As the court has already discussed, however, that
was true only at the beginning, before any association between
the public and <u>any</u> aspect of the performances has been
demonstrated; by the time that occurred, it was not content, but
style, that had caught the public's interest.

majority of these segments, he argues that he could have--by firing Ligotti if he refused to play "The Guy from Boston" as Garofalo envisioned the character.  "Fortunately," Garofalo explains, he "never had a reason to exercise his right" because he "never disagreed with the content of the . . . performances (which was consistent with his concept of the character--although toned down for television)."

But "the correct legal question in this context is not who controlled whom, but who controlled the distinctive feature which the mark identifies."  <u>Bell</u>, 640 F. Supp. at 581 n.17.  A party's mere "authority" over this feature as a matter of contract or agency law, if not actually used for that purpose, has no impact on what the public comes to identify with the mark and therefore has little relevance to "which party controls or determines the nature and quality of the goods which have been marketed under the mark in question."  <u>Id.</u> at 580 (internal quotation marks omitted).  As a practical matter, Garofalo had no way to "control" what Ligotti said or how he acted during his television appearances, as illustrated by Garofalo's largely unsuccessful attempt to turn the "Tonight Show" segment into a "plug-fest" for the website or cigar business.[33]  Moreover, despite Garofalo's

---

[33]Even as a legal matter, Garofalo's "right" to control Ligotti's performances, particularly in media outside of the

claim that he owned the "Guy from Boston" name and would not allow Fox 25 to use it, Ligotti went on to make repeated appearances there as "The Guy from Boston," in segments Garofalo had, for all intents and purposes, no way of controlling. See Cardenas Corp. v. Johnson, No. 92-0249, 1992 WL 455226, at *2 (D. Minn. May 7, 1992) (finding host of television show had proven likelihood of success on merits of claim to its name, despite co-host's registration of it as trademark, where host had previously engaged in "actions consistent with ownership of the mark").

This lack of control undermines Garofalo's reliance on Rick v. Buchansky, where the court found that the manager of the musical group "Vito and the Salutations," rather than its original members, owned the name. 609 F. Supp. at 1536. As an initial matter, the manager in Rick, unlike Garofalo, held a registered trademark in the name, triggering a presumption, inapplicable here, that he owned it. Id. at 1531 (citing 15 U.S.C. § 1115(a)). In trying to overcome this presumption, the group's original members argued, first, that the manager had been their "mere employee" who could have thus acquired nothing more than a "temporary license" to use the mark. Id. at 1532. It was only in rejecting this argument that the court relied on the

---

website, is unsettled, for reasons already discussed.

48

facts Garofalo cites in likening himself to the manager, _e.g._, that he formed the group, proposed the name, and handled the group's financial affairs, including paying its expenses.  Id. at 1532.  Rick therefore does not support Garofalo's view that, because he took on those responsibilities, he owns "The Guy from Boston" mark regardless of his relative lack of control over the qualities the public has come to associate with it.

Indeed, Rick relied on the same sort of public association analysis as Bell in rejecting another one of the original members' arguments:  that the manager "cannot claim ownership of the mark 'VITO AND THE SALUTATIONS' because the public identifies that mark with the performers themselves, and chiefly with Vito Balsamo," the group's original lead singer.  609 F. Supp. at 1534-35.  The court found, among other things, that the original members had "not demonstrated that Balsamo developed any particular notoriety during his tenure in that role," such as through "evidence that Balsamo or any other members of the group received particular media attention . . . through exposure on radio or on television."  Id. at 1535.  As is clear by now, that cannot be said of Ligotti.  Rick is entirely consistent with the court's analysis of the ownership issue here.

Returning to Garofalo's "concept character" argument, because Garofalo does not "control the product," or at least

those aspects of the product the public has come to associate
with the mark, "The Guy from Boston" does not fit that
description.  Bell, 640 F. Supp. at 581 n.18.  Furthermore, the
characteristics essential to Garofalo's "concept" of "The Guy
from Boston"--a Boston-based version of "The Kid from Brooklyn"
who would present libertarian views by "ranting" in front of an
American flag, cigar in hand--were no longer the mark's
distinguishing features by the time it achieved public
recognition, as has been discussed.  This is in contrast to Bell,
where Starr appears to have based his "concept group" claim on
the fact that "New Edition" had become famous while acting out
his idea--"essentially the Jackson Five updated by the addition
of modern elements like synthesizers and rap."[34]  640 F. Supp. at
578 (parentheticals omitted).  And, widening the focus from
somewhat elusive "concept group" theory presented to the district
court to more generalized equitable considerations endorsed by
the court of appeals in Bell, 761 F.2d at 76, this court does not
perceive any inherent unfairness in refusing ownership of a mark
to a party who came up with an idea for it, but later took a

---

[34]The Bell court ultimately rejected this claim, finding, in
essence, that the concept had originated as much with the
original members of the group as with Starr.  640 F. Supp. at 581
n.18 ("They may have walked straight into Starr's concept but, as
he conceded . . . , they seem to have had the same idea.").

backseat as another party substantially transformed the services in question into those which consumers came to associate with it. This approach merely awards the mark to the party most responsible for its success in gaining public recognition.

A contrary approach, moreover, would essentially award trademarks on ideas, limited only by the amorphous contours of the creator's concept, rather than by what it comes to signify to the public. This is anathema to the principles of trademark law, which awards rights on the basis of effective use, not "discovery or invention." 2 McCarthy, supra, § 16:11, at 16-23--16-24. Accordingly, "[a] business plan or a concept for a new trademark does not in itself establish protectable trademark rights . . . . They are established only through prior use of the mark in the marketplace," id. at 16-25 (internal quotation marks and footnote omitted), which must also be sufficient to create secondary meaning if the mark is not inherently distinctive, id. § 16:34, at 16-56. That was not accomplished by Garofalo's concept for "The Guy from Boston," which, by his own account, did not envision the personality, physical appearance, or ethnicity that have become the character's hallmarks. It might be a different story if the public had come to know "The Guy from Boston" as little more than a Boston version of "The Kid from Brooklyn," as Garofalo imagined; the significance of the mark would have been

51

his concept, rather than Ligotti's characterization.  But that is
not how things turned out, and this court cannot blind itself to
that fact in deciding an issue of trademark ownership.

     Garofalo protests that, under this reasoning, "a
screenwriter or playwright would never be able to create a live
performance of his/her work without ceding ownership of the name
to the actors who played the role in the first production."  This
analogy, however, does Garofalo more harm than good.  It gets its
intuitive appeal from the fact that characters in literary works
can be copyrighted, 1 Melville B. Nimmer & David Nimmer, <u>Nimmer</u>
<u>on Copyright</u> § 2.12, at 2-178.25 (1978 & 2008 supp.), giving the
screenwriter or playwright in Garofalo's example the right to the
character without regard to trademark law.[35]  But Garofalo holds
no copyright in "The Guy from Boston" character.

     Even as a matter of trademark law, though, Garofalo's
example does not call the wisdom of the <u>Bell</u> test into question.
When the public becomes familiar with a character through its

---

[35]In making this point, Garofalo has repeatedly argued that,
if Ligotti owns the trademark in "The Guy from Boston," Sean
Connery must own the trademark in "James Bond," since he was the
first actor to play the character in film.  So it is instructive
to note that, when the owners of the James Bond character as
manifested in a number of films sued to prevent the use of an
allegedly similar figure in a commercial, they proceeded under a
copyright, rather than a trademark, theory.  <u>Metro-Goldwyn-Mayer,</u>
<u>Inc. v. Am. Honda Motor Co.</u>, 900 F. Supp. 1287 (C.D. Cal. 1995).

appearance in a stage or screen production, it is likely to associate that character with the things he or she says or does during the production, which are necessarily a function of its other elements, _e.g._, plot, setting, theme, and the like.[36] These qualities are firmly within the author's control, even allowing for a wide degree of improvisation on the actor's part. Under <u>Bell</u>, then, the author in Garofalo's example would own the trademark in the character's name.   <u>Cf.</u> 1 J. Thomas McCarthy, <u>The Rights of Publicity and Privacy</u> § 4:70 (2d ed. 2000).  But "The Guy from Boston" did not achieve public recognition through performances written and otherwise controlled by Garofalo--as already discussed, consumers have come to know the character not for what he says but for how he says it, and Garofalo has exercised little if any control over that aspect of the services.

Based on the record as it stands, then, Garofalo is not like the authors who gave us James Bond, Indiana Jones, Harry Potter, or any of the other wildly popular fictional characters to whom he attempts to liken "The Guy from Boston."  He is merely the originator of an idea for "The Guy from Boston" which, though certainly instrumental to its eventual success, did not come to

---

[36]Contrary to Garofalo's suggestion, the "first performance" would not confer ownership of a trademark in the character's name to anyone, except in the unlikely event that the name was inherently distinctive.  <u>See</u> 1 Callman, <u>supra</u>, § 4:66, at 4-735.

define it.  For his contributions, Garofalo deserves credit--and
possibly even a share of all of Ligotti's earnings as "The Guy
from Boston," though the court has not yet been asked to decide
that issue--but they do not give him ownership of the mark.  <u>See</u>
<u>Compton v. Fifth Ave. Ass'n, Inc.</u>, 7 F. Supp. 2d 1328, 1331 (M.D.
Fla. 1998) ("the fact that [a party] first conceived of the mark
. . . is irrelevant to his ownership of the mark").  The court
rules that Ligotti has shown the greater likelihood of success on
his claim to ownership of "The Guy from Boston" mark.

### B.   <u>Balance of Harms and the Public Interest</u>

As noted <u>supra</u>, when a party demonstrates his likely success
on the merits of a trademark claim, it is generally presumed that
he will suffer irreparable unless an injunction issues and that
doing so is in the public interest.  <u>See</u>, <u>e.g.</u>, <u>Borinquen Biscuit</u>
<u>Corp.</u>, 443 F.3d at 115.  Garofalo does not contest either of
these factors here.  Nor does he argue that any harm he will
suffer if an injunction enters against him outweighs the harm
Ligotti will suffer if one does not.  While Garofalo has
maintained the www.theguyfromboston.com website in Ligotti's
absence, those efforts appear to have generated little if any
sales; the site, in its current form, has no advertising and does
not offer any merchandise.  Ligotti, meanwhile, has continued to

54

appear as "The Guy from Boston" on the www.theguyfromboston.net website as well as in the mainstream media, but the continued operation of the ".com" site has distracted from those efforts, as the e-mails he has received from confused fans suggest.  The court finds that the balance of harms tips in Ligotti's favor.

### C.    Form of the Preliminary Injunction

Under Rule 65(c) of the Federal Rules of Civil Procedure, a court "may issue a preliminary injunction . . . only if the movant gives security in an amount proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined."  Nevertheless, "the posting of a bond is not a jurisdictional prerequisite to the validity of a preliminary injunction," particularly where, as here, the enjoinee has not asked the court to require any.  Aoude v. Mobil Oil Corp., 862 F.2d 890, 895-96 (1st Cir. 1988).  In any event, given the complete lack of any evidence of sales or other profit-generating activity from the www.theguyfromboston.com website since Ligotti was replaced, the court finds that Garofalo would suffer only negligible, if any, "costs or damages" from the injunction.  The court therefore declines to require Ligotti to post security. See Hill Design, Inc. v. Hodgson, 2003 DNH 59, 29, rept. & rec. adopted, No. 03-74 (D.N.H. Sept. 2, 2003); 13 James Wm. Moore et

al., Moore's Federal Practice § 65.53, at 65-108 (3d ed. 1997 & 2007 supp.) ("Security may . . . be waived when granting injunctive relief carries no risk of monetary loss to the party enjoined or restrained.") (footnote omitted).

The court nevertheless declines to issue the injunction entirely in the form proposed by Ligotti.  Ligotti asks this court to order Garofalo to:  (1) stop using the mark "The Guy From Boston", (2) restore the "www.theguyfromboston.com" website to the state it was in before Ligotti was replaced, (3) refrain from using that site to display any "Guy From Boston" besides Ligotti, (4) "return or provide [Ligotti] with exact copies of all video, DVD or other recordings of Ligotti's performances," (5) preserve all relevant evidence, (6) "account for and distribute to Ligotti on a monthly basis, any proceeds from the website," and (7) stop using the www.joeligotti.com website (which Garofalo testified he has already done).

In the court's view, requests (2), (4), and (6) do not follow from its decision that Ligotti is more likely than Garofalo to succeed on his claim to ownership of "The Guy from Boston" mark.  On this ruling, Garofalo's use of the ".com" website to showcase the work of Ligotti's replacement amounts to trademark infringement, see, e.g., Audi AG v. D'Amato, 469 F.3d 534, 546 (6th Cir. 2006), but Garofalo nevertheless continues to

own the domain name, cf. Sallen v. Corinthians Licenciamentos
LTDA, 273 F.3d 14, 19-20 (1st Cir. 2001) (distinguishing between
domain name registration and trademark rights), and Ligotti has
not shown a likelihood of success on any theory in support of his
motion for preliminary injunctive relief which would require
Garofalo, in essence, to relinquish that ownership interest.  See
Kremen v. Cohen, 337 F.3d 1024, 1031 (9th Cir. 2003) (treating
domain name as intangible property under California law).

     Similarly, Ligotti has not shown a likelihood of success on
any claim to an ownership interest in the recordings of his "Guy
from Boston" performances as tangible goods.  His likely success
on his trademark claim demands that Garofalo stop using those
recordings, but it does not prevent him from possessing them or
force him to copy them for Ligotti; when Garofalo created those
recordings, he was not engaged in an unauthorized use of "The Guy
from Boston" mark, but was working with Ligotti as part of their
joint endeavor to provide services under the name.  Cf. Anheuser-
Busch, Inc. v. Caught-on-Bleu, Inc., 288 F. Supp. 2d 105, 126
(D.N.H. 2003) (ordering destruction of competitor's goods bearing
infringing mark), aff'd, 105 Fed. Appx. 285 (1st Cir. 2004).  In
short, the issue of who owns the personal property created as
part of "The Guy from Boston" venture is separate from the issue
of who owns "The Guy from Boston" mark, and was not presented to

57

the court for resolution as part of the injunction proceedings.[37]
Garofalo must therefore preserve that property pending the
resolution of that dispute on the merits, as Ligotti requests,
and the parties are of course free to arrive at an agreement for
its temporary disposition in the interim.

Finally, Ligotti's claim to any profits from the ".net" site
(assuming, _dubitante_, that there have been any) can be fully
remedied by monetary relief and is therefore not an appropriate
subject for an injunction.  See _Charlesbank Equity Fund II v._
_Blinds to Go, Inc._, 370 F.3d 151, 162 (1st Cir. 2004).


IV.  **Conclusion**

For the foregoing reasons, Ligotti's motion for temporary
restraining order and preliminary injunction (document no. 2) is
GRANTED in part.  Garofalo's cross-motion to that effect
(document no. 7) is DENIED.  The court hereby enters a
preliminary injunction incorporating paragraphs (1), (3), (5),
(7), and (9) of Ligotti's "Proposed Temporary Restraining Order"
(document no. 2-4) to remain in effect pending resolution of this
case on the merits.  The court will make every effort to achieve
that resolution expeditiously, but encourages the parties to

---

[37]As previously noted, Ligotti did make a copyright claim,
but he holds no registered copyrights.  See note 1, _supra_.

attempt an extrajudicial resolution of this matter in the
meantime.

      **SO ORDERED.**

                                   _____
                                   Joseph N. Laplante
                                   United States District Judge

Dated:  June 26, 2008

cc:  Mark C. Rouvalis, Esq.
     Eric M. Sommers, Esq.
     Daniel E. Will, Esq.
     Donald L. Smith, Esq.

59